NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0542n.06

No. 10-5703

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

WILLIAM D. FOWLER, LINDA A. FOWLER,    )
                                      )

      Plaintiffs-Appellees,    )

                                        )

v.    )  ON APPEAL FROM THE UNITED
                                       )  STATES DISTRICT COURT FOR

STEVEN BURNS, et al.,    )  THE EASTERN DISTRICT OF
                                       )  TENNESSEE

      Defendants,    )

                                         )

and    )

                                         )

BUDDY RANDOLPH, James "Buddy" Randolph;    )
MIKE FINCHER; JOHN HUFFINE,    )

                                       )

      Defendants-Appellants.    )

                                         )

FILED
*Aug 04, 2011*
LEONARD GREEN, Clerk

Before: SILER, COLE, KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Greene County, Tennessee Detectives John Huffine, Mike Fincher, and James Randolph arrested William and Linda Fowler for concealing a stolen lawn mower. After questioning the Fowlers, the detectives thought the evidence was insufficient for a conviction, so they released the Fowlers without filing charges. The Fowlers thereafter sued the detectives, primarily alleging that they lacked probable cause for the arrest. The detectives moved for summary judgment on numerous grounds, including qualified immunity. The district court granted the motion in part. The detectives now appeal, reasserting their immunity defense for the Fowlers' remaining claims.

I.

We take the district court's view of the facts in the light most favorable to the Fowlers. *Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011). The lone question on appeal is whether the detectives are shielded by qualified immunity, so we limit our discussion to the information they possessed at the time. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

A.

On January 7, 2007, a Greene County, Tennessee business reported the theft of five "Toro-red," zero-turn, riding lawn mowers. The same day, Detective Fincher interviewed Betty Huff, a local resident. She reported seeing a pickup truck pulling several riding mowers towards Old Chuckey Highway, which is in the "general direction" of the Fowlers' home on Sand Bar Road.

Almost a month later, on Friday, February 2, 2007, Fincher interviewed Charles Mosier at the Unicoi County jail. Mosier and Charles Williams had been arrested for driving a stolen truck and were suspects in the mower heist. Mosier told Fincher that he and Williams had done some work on the Fowlers' home, and that Williams had sold one of the stolen mowers to the Fowlers for $4,500 on the day of the theft. Mosier had provided additional information that led to the recovery of other mowers, so Fincher credited the tip.

Fincher called Huffine and relayed Mosier's story. Huffine and another officer went to the Fowlers' home. When no one answered the door, the officers looked for the Fowlers in the outbuildings on the property. In an open shed, Huffine saw "a tarp over a large object that was in the shape of a zero-turn riding lawnmower." (Huffine Aff. ¶ 3.) Huffine could see the bottom of

the mower, which looked new and was "Toro red" in color. He lifted the tarp, checked the serial number, and confirmed that it was one of the stolen mowers.

Officers waited for the Fowlers to return home, fearing the mower might "disappear." Huffine then questioned the Fowlers. Mr. Fowler reported that he had discovered the mower earlier that day and "had called the Unicoi County Sheriff [Harris] that morning and reported the discovery of the lawnmower." (Huffine Aff. ¶ 4.) The Fowlers denied purchasing the mower from Williams or having any knowledge of it before that morning. On Monday, February 5, 2007, the detectives learned that Sheriff Harris had been out of town on February 2, when Mr. Fowler claimed to have reported the newly discovered mower.

Fincher also spoke to Detective Herman Hagey of the Washington County Sheriff's Office. Fincher learned from Hagey that the Fowlers had purchased a new farm tractor and trailer from Williams, for "$12,000 in cash that they had around the house." The tractor was later determined to be stolen. The tractor theft apparently was separate from the mower theft.

B.

Based on these facts, the detectives collectively determined they had probable cause to arrest the Fowlers for committing "theft of property" in violation of Tennessee Code Annotated § 39-14-103. The detectives sent deputies to bring the Fowlers in for questioning. Mr. Fowler was leaving for a doctor's appointment when they arrived. The deputies told him to report to the station when he was finished. The deputies then entered the Fowlers' home, without a warrant or consent, and took Ms. Fowler into custody.

Fincher thereafter questioned the Fowlers, who continued to deny knowledge that the mower was stolen or even that it had been stored on their property. Fincher believed he could not obtain a conviction without Williams's testimony. Williams refused to give a statement, however, since he was facing criminal charges for the theft. Fincher released the Fowlers the same day. The Fowlers have never been charged with any crime arising out of these events.

The Fowlers brought suit against the detectives, asserting claims for unlawful search, unlawful entry, unlawful arrest, excessive force, and violation of equal-protection under 42 U.S.C. §§ 1983 and 1988, as well as several state-law claims. The detectives moved for summary judgment on all claims. The district court granted the motion in part, but denied the detectives' request for qualified immunity on the Fowlers' federal and state-law claims for unlawful-arrest and unlawful-entry. The detectives appeal that denial.

## II.

To the extent this interlocutory appeal turns on an issue of law, we have jurisdiction to consider it. *See Hayden*, 640 F.3d at 152. The Fowlers bear the burden of defeating the detectives' qualified-immunity defense. *Id*. at 153. We review the district court's decision de novo. *Id*.

## A.

The Fowlers first claim that the detectives arrested the Fowlers without probable cause. We generally begin a qualified-immunity inquiry by determining whether the officers violated a constitutional right. *See id*. The district court denied summary judgment on this question, reasoning that a jury could find that the detectives lacked probable cause for arresting the Fowlers.

But the detectives argue they are entitled to qualified immunity nonetheless. "It is inevitable" that police officers "will in some cases reasonably but mistakenly conclude that probable cause is present[.]" *Creighton*, 483 U.S. at 641. The law accounts for these mistakes by providing officers with immunity from suit unless their "conduct violate[s] a clearly established constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). In the context of a probable-cause determination, that means an officer is immune from suit unless it was apparent that "the circumstances with which [the arresting officer] was confronted *did not* constitute probable cause." *Creighton*, 483 U.S. at 640-41 (emphasis added). We therefore must consider "whether a reasonable officer could have believed" the arrest was lawful, "in light of clearly established law and the information the [arresting] officers possessed." *Id*. at 641.

An officer has probable cause if there is a "fair probability" that the suspect has committed a crime. *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003) (internal quotation marks omitted). Here, the detectives thought the Fowlers had committed "theft of property," by their receipt or concealment of the stolen mower. So we must determine whether a reasonable officer, knowing what these detectives knew, could have believed that the Fowlers "knowingly" received or exercised control over a stolen mower "with intent to deprive the owner of [the] property." Tenn. Code Ann. § 39-14-103.

An officer normally is entitled to rely on eyewitness accounts for purposes of determining probable cause. *See Crockett v. Cumberland College*, 316 F.3d 571, 584 (6th Cir. 2003). Here, Mosier reported that the Fowlers bought the mower on the day of the theft. Mosier was credible, since he led the officers to other stolen mowers, and since the Fowlers in fact possessed one of the

stolen mowers. Huff's statement that she saw the mowers being hauled towards the Fowlers' place on the day of the theft adds some corroboration. In addition, officers could have reasonably believed the mower had been stored in an unlocked shed, partially covered by a tarp, for nearly a month. We think a reasonable officer faced with these facts could conclude that the Fowlers knowingly received or concealed the mower.

We also think an officer reasonably could have believed the Fowlers intended to deprive the owner of the mower. An officer could have believed that the mower had been on the Fowlers' property for weeks. Yet the Fowlers claimed, coincidentally, to have discovered it the very morning the officers came looking for it. The Fowlers also told the detectives they had reported their discovery to Sheriff Harris. Yet Harris was out of town at the time of the alleged call. From these facts, the detectives reasonably could have believed the Fowlers were trying to hide the mower and were lying about their recent discovery of it.

The Fowlers concede that the evidence "did perhaps raise suspicion sufficient enough to warrant further investigation." (Fowler Br. at 20.) They say the detectives could have "questioned the Fowlers" and "double-check[ed] any answers" they gave. (*Id.*) But an officer is not required to believe a criminal suspect's story. *See Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999). And once an officer establishes probable cause, he has no obligation to investigate further before making an arrest. *Crockett*, 316 F.3d at 581.

The Fowlers next argue that neither Mosier's story (that the Fowlers bought the stolen mower) nor the Fowlers' story (that they had just discovered it) was necessarily inculpatory. We have explained that the detectives were entitled to credit Mosier's version. That story left room for

the Fowlers to admit purchasing the mower, while disclaiming knowledge that it was stolen. But the Fowlers denied all knowledge of the mower, which itself could have seemed suspicious given the extended time the mower was on their property. And it is not apparent why Mosier would say that the Fowlers had bought the mower, if the thieves had stashed it (in plain sight) on the Fowlers' property. We think a reasonable detective could find the discrepancy in the two stories supported a probable-cause determination.

The Fowlers argue, however, that "any possible suspicion of bad motive" is negated here by other evidence in the case. (Fowler Br. at 22.) Specifically, the Fowlers argue that "it must be assumed" that the detectives knew that the Fowlers had voluntarily returned the tractor when they learned it might have been stolen. The district court agreed, explaining: "Since Fincher knew about the stolen tractor, he should have known" how the tractor came to be returned to its rightful owner. The detectives respond that a reasonable officer could have believed the Fowlers turned in the tractor because it was too difficult to hide, while retaining the smaller mower, concealed in the shed. We agree with the detectives on that point. In addition, the detectives knew that the Fowlers had paid for the tractor with $12,000 cash. That fact too supported a theory that the Fowlers knew that Mosier and Williams were fencing stolen goods, which in turn supported the theory that the Fowlers knew the mower was also stolen.

Finally, the Fowlers argue that a fact question remains as to whether Mr. Fowler told Huffine that he had called *for* Sheriff Harris, as Mr. Fowler contends, or if Mr. Fowler said he had spoken to Harris, as Huffine understood. We evaluate probable cause based on what the officers knew at the time of the Fowlers' arrest. *See Creighton*, 483 U.S. at 641. And it is undisputed that the

-7-

detectives thought Fowler claimed to have spoken to Sheriff Harris on Friday, February 2, 2007. (The Fowlers' response that the detectives misunderstood them is not relevant for our purposes.) When the detectives learned Harris had been out of town that day, they were entitled to add Fowler's apparent lie to the probable-cause side of the scale.

Given the extended time the officers reasonably believed the mower had been on the Fowlers' property; Mosier's credible tip; the Fowlers' denial that they had purchased the mower coupled with their claimed coincidental discovery of it; the Fowlers' large cash purchase of the stolen tractor; and the detectives' belief that the Fowlers had lied about calling Sheriff Harris, the Fowlers have not met their burden of showing, as a matter of law, that any reasonable officer would have known the evidence did not amount to probable cause. *See Creighton*, 483 U.S. at 640-41. The detectives are entitled to qualified immunity for the arrest.

3.

The Fowlers also brought state-law false-arrest and false-imprisonment claims against the detectives. Tennessee's discretionary function immunity parallels the federal qualified-immunity analysis. *See Rogers v. Gooding*, 84 F. App'x 473, 477 (6th Cir. 2003). The Fowlers rely on their federal arguments to overcome the detectives' state-law immunity. For the reasons we have explained, we reject those arguments. The detectives are entitled to state-law immunity for these claims.

B.

Ms. Fowler also claims that the deputies who arrested her entered her home without a warrant or consent, in violation of the Fourth Amendment. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

These detectives, however, were not present for the arrest. Ms. Fowler nevertheless seeks to hold them liable because one of them—it is not clear who—instructed the arresting deputies to "bring the Fowlers in" for questioning.

Section 1983 liability does not attach to a supervisor unless he "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Petty v. County of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007) (internal quotation marks omitted). Ms. Fowler argues that a jury could find that the detectives implicitly authorized the deputies' warrantless entry by directing them to "bring the Fowlers in" for questioning without "follow[ing] this instruction with any caveat that the deputies were not to enter the house itself." (Fowler Br. at 31.) Ms. Fowler has not cited any authority supporting such a broad theory of supervisory liability. We will not adopt a rule that would require every supervisor, issuing every routine directive, to remind his subordinates to carry out their duties within the bounds of the Constitution. *Cf. Harlow v. Fitzgerald,* 457 U.S. 800, 818-19 (1982) ("a reasonably competent public official should know the law governing his conduct"). There simply is no evidence that any detective, let alone three of them, authorized the arresting deputies to enter Ms. Fowler's home without her consent. The detectives are entitled to qualified immunity on this claim as well.

\*     \*     \*

The district court's denial of qualified immunity is reversed and the case remanded for proceedings consistent with this opinion.